FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 AUG -9 PM 3: 11
U.S. DISTRICT COURT
N.D. OF ALABAMA

WILLIAM SCOTT and          )
CLAUDE WOODY,              )
                          )
        Plaintiffs,        )        CV-96-P-1657-S
                          )
-vs.-                     )
                          )
FONTAINE FIFTH WHEEL,     )              AUG 10 1999
                          )
        Defendant.         )

## MEMORANDUM OPINION

The defendant filed its Motion for Summary Judgment in this race discrimination case on October 21, 1997. The motion was taken under submission as of January 22, 1999, by agreement of the parties. For the reasons expressed below, the court finds that the defendant's summary judgment motion is due to be granted.

Facts

The plaintiffs, William Scott and Claude Woody, both black males, bring this action against the defendant, Fontaine Fifth Wheel ("Fontaine"), asserting claims for race discrimination with regard to their compensation in violation of Title VII & § 1981. Fontaine is a Delaware corporation which operates a manufacturing plant in Birmingham, Alabama. Fontaine manufactures "fifth wheels," which are parts that connect a truck trailer to a truck cab.

William Scott ("Scott") began working for Fontaine in August 1994 as a technician, with a

1

rate of pay of $6.25 per hour.[1] Over the next two years, Scott "bid on" and was awarded promotions and pay raises within the company.[2] By late 1995, Scott had been promoted to a "welder" position and his pay had increased to $11.05 per hour.[3] Claude Woody also began working for Fontaine in August 1994 as a technician and was soon promoted to the position of tacker. Woody also filled in as a temporary welder in early 1995, earning the higher welder's rate of $9.19 per hour.  In May 1995, Woody received a raise based on his tacker's position. Another raise in October 1995 pushed Woody's tacker salary up to $10.15 per hour.

In October/November 1995, the production needs of the plant changed, resulting in reduced work hours and workforce. On November 19, 1995, a company-wide layoff took effect. The layoff policy allowed less senior employees to "bump" down into permanent positions that those employees formerly held by either direct hire or promotion. Displaced employees could not bump into positions that they previously held on a temporary or informal basis.

At the time of the layoff, Scott held a welder's position and Woody was employed as a tacker. Scott was unable, based on his seniority, to hold onto his welding position. However, Scott was bumped down to a tacker position, thereby displacing five white tackers who had less seniority. Scott

---

[1] The technician position is the entry level, unskilled labor position at the plant.

[2] During the relevant time period, Fontaine's promotion policy provided that the company would attempt to fill all permanent openings for hourly positions first through an internal posting process. Under the procedure, Fontaine notified plant employees of an opening for an hourly position by posting a notice within the plant for three days. Employees were required to indicate their interest in the position by signing their name on the posting. At the conclusion of the three day period, the posting was taken down and the position was awarded to the most senior qualified applicant.

[3] According to Scott, about 20-25% of the time that he worked as a welder her performed non-welder jobs, including tacking. Scott was paid at the higher welder rate, however, even though he helped with non-welding duties.

received $10.15 per hour after being bumped down.[4] Woody retained his tacker position because of his seniority, and, like Scott, was paid $10.15 per hour. According to Fontaine, the rate of pay both Scott and Woody received in their post-layoff positions was greater than that of the four white employees (Pennington, Gardner, Zavatchen and Cagle) who served as tackers after the layoff. However, Scott and Woody claim that Jason Cagle was being paid more than the $10.15 per hour, the rate at which they were being paid.[5]

The alleged difference in pay between Scott/Woody and Cagle is the basis for this Title VII/§ 1981 lawsuit.[6] According to Scott and Woody, Fontaine was motivated by illegal racial discrimination by paying Cagle a higher wage. Scott and Woody's main support for their claim of intentional discrimination is based on a statement allegedly made by supervisor Tom O'Donnell to Cagle in which O'Donnell stated, "Why are you complaining? You're the highest paid tacker that I've got back here, you're getting the band saw operator pay; why are you complaining?" Fontaine, on the other hand, asserts that Cagle was mistakenly overpaid and the company began recovering the overpayment upon discovery of the clerical error.

<u>Analysis</u>

Because the plaintiffs have presented no direct evidence of discrimination in this case, the

---

[4] Scott was paid $10.15 per hour, a twelve-month tacker rate, because of his experience in both the tacker and welder positions.

[5] Cagle was employed as a power saw operator prior to the layoff. As a result of the layoff, Cagle was moved to a position as a tacker but believed that the move was temporary and that he would be returning the position of power saw operator soon. According to Cagle, he was not concerned by the higher rate of pay he was receiving while doing tacker work because he thought he would be returning to his former job as a power saw operator.

[6] This lawsuit was filed June 25, 1996.

3

Case 2:96-cv-01657-SCP   Document 16   Filed 08/09/99   Page 4 of 5

court reviews the plaintiffs' case under the burden-shifting model of <u>McDonnell Douglas</u> and its progeny. 411 U.S. 792 (1973). In order to establish their prima facie case of discrimination with regard to compensation, the plaintiffs must prove that: (1) they are members of a protected class, and (2) they are being paid less than persons outside the protected class who are performing the same jobs. <u>See</u> <u>Blount v. Alabama Cooperative Extension Service</u>, 869 F. Supp. 1543, 1550 (M.D. Ala. 1994). Here, Scott and Woody have presented a prima facie case of discrimination.

However, in response to the plaintiff's prima facie case, the defendant has offered a legitimate, non-discriminatory reason for the difference in pay. According to the defendants, the only reason that Cagle was temporarily paid at a higher rate after the November 1995 layoffs was because of a mistake committed by the human resources department which, despite Fontaine's good faith efforts to correct the mistake, was compounded by the company's payroll department. Furthermore, the company deducted money from Cagle's paycheck after learning of the overpayment - - until Cagle quit working for Fontaine - - and made attempts to collect the surplus even after Cagle's resignation. Fontaine has presented ample evidence of its non-discriminatory reason for the discrepancy in pay.

Although Scott and Woody attempt to show that the defendant's reason for the pay discrepancy is pretext for discrimination, they fail to meet this burden. The plaintiffs argue that they have shown pretext in that their supervisor, O'Donnell, sometimes used the term "you people" when referring to black people and allegedly made a statement to Cagle about the fact that he was the "highest paid tacker in the company." The plaintiffs also assert that "O'Donnell was a decision maker in Cagle receiving his compensation." While it may be true that O'Donnell, as Cagle's supervisor, did "sign off" on promotion/raise forms, there is no evidence from which a reasonable jury could conclude that the temporary discrepancy in pay was the result of intentional racial animus by

4

either O'Donnell or Fontaine.  Indeed, Fontaine acknowledges that a mistake was made by its human resources and payroll department but has presented evidence that the error was corrected once discovered.  As the Eleventh Circuit has consistently held, an honest mistake by an employer is not evidence of pretext or illegal discrimination.  See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984); Smith v. Papp Clinic, P.A., 808 F.2d 1149 (11th Cir. 1987).

Because Scott and Woody have failed to present any significant probative evidence that Fontaine's reasons were pretext, the court finds that summary judgment is due to be granted in favor of the defendant.

Date: _____August 9_____, 1999.

_____
Chief Judge Sam C. Pointer, Jr.

Service List:
> Robert F. Childs, Jr.
> Alan H. Garber
> Thomas S. Bradley
> James R. Shaw

5